## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:  CDP CORPORATION, INC.                              **CASE NO. 09-50745-KMS**

      **DEBTOR**                                                         **CHAPTER 7**

**KIMBERLY R. LENTZ, CH. 7 TRUSTEE**
**FOR DEBTOR, CDP CORPORATION, INC.**                              **PLAINTIFF**

**VS.**                                             **ADV. PROC. NO. 11-05025-KMS**

**CAHABA DISASTER RELIEF, LLC,**
**AND EQUIPMENT LEASING**                                    **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER
### GRANTING IN PART AND DENYING IN PART MOTION
### FOR EMERGENCY RELIEF
### AND OVERRULING DEFENDANTS'
### EVIDENTIARY OBJECTIONS

This matter came on for hearing on Friday, June 24, 2011, (the "Hearing") on the

Emergency[1] Motion to Extend The Automatic Stay To Non-Debtor Third Party And To Stay All

Proceedings In The Louisiana Eastern District Court (Dkt. No. 5) (the "Motion") filed by

Kimberly Lentz, the Chapter 7 Trustee (the "Trustee"), and the Responses to the Motion filed by

the Defendants Equipment Leasing, LLC ("Equipment") (Dkt. No. 27) and Cahaba Disaster

Relief, LLC  ("Cahaba") (Dkt. No. 28) (corporately referred to as the "Defendants"). At the

Hearing, James E. Bailey III appeared on behalf of the Trustee, Daniel A. Tadros and Adelaida J.

---

[1]It appears that the Motion was labeled an "Emergency" Motion based on a docket entry in an allegedly related case pending in the United States District Court for the Eastern District of Louisiana that indicated that on June 30, 2011, the district court might rule on a motion for summary judgment pending in that matter. See Equipment Leasing, LLC v. Three Deuces, Inc., No. 10-2628 (filed 8/10/2010) (Dkt. No. 50). However, at the Hearing it was explained that although the Louisiana District Court docket notes that a hearing on the motion for summary judgment was scheduled for Thursday, June 30, 2011, this docket entry simply marked the day when the district court would officially take Equipment's motion for summary judgment under advisement. The attorneys for the parties were not scheduled to appear in court, and no argument would be heard on that day.  The Court also notes that the motion for summary judgment was filed in the Louisiana action on February 17, 2011, well before the Trustee filed the instant adversary proceeding (May 26, 2011) or the instant Motion (June 10, 2011).

Ferchmin appeared on behalf of Equipment and James J. McNamara IV ("McNamara") appeared on behalf of Cahaba. The Trustee and Benny Taylor of Taylor Auction & Realty, Inc. (hereinafter "Taylor" or "Taylor Auction") were called as witnesses for the Trustee, and Scott Robert Cheatham ("Cheatham")[2] was called as a witness for Cahaba. The Court, after considering the pleadings, the testimony of the three witnesses, the arguments of counsel, the admitted exhibits and the relevant legal authorities, and for the reasons discussed below, finds that the Trustee's Motion should be **GRANTED** in part and **DENIED** in part.

The day before the Hearing, the Trustee filed a Witness List (Dkt. No. 31) and an Exhibit List (Dkt. No. 32). Equipment and Cahaba filed objections to these lists on the same day. (Dkt. Nos. 33 and 34). The Defendants argued that they had not been provided an adequate opportunity to prepare for the witnesses, rebut the testimony offered or review the proposed exhibits. The Court overruled these objections from the bench at the outset of the Hearing.[3] At

---

[2]Cheatham's testimony was very narrow in scope and, beyond this footnote, is not summarized further in this opinion. He is employed as an attorney at Adams and Reese in New Orleans, Louisiana. He testified that in August of 2009, he took part in a meeting with the Trustee and others in Waveland, Mississippi for the purpose of coordinating the retrieval of several items owned by Cahaba and one item owned by Equipment. Cheatham was provided a list of equipment identifying 8 or 9 separate items to retrieve from 3 different locations. In order to oversee the retrieval of his clients' equipment, Cheatham went with the Trustee to locations in Waveland and Kiln, Mississippi. Cheatham testified that he did not go to the Rigolets location on the day in question or on any other day.

[3]At the Hearing, the Court explained that under the local rules the Trustee was under no obligation to file the contested Witness List and the Exhibit List for this particular hearing. In short, Equipment and Cahaba received more notice via the contested lists than they would generally receive in a hearing of this nature in this Court. Thus, their objections, urging that they had an inadequate opportunity to review the exhibits and prepare for these witnesses, are, in the context of local practices, without basis. Furthermore, as counsel for the Trustee noted, it is hard to imagine that Equipment and Cahaba were surprised that the Trustee who allegedly sold Barge CGB-68017 and the auctioneer who allegedly facilitated that transaction were called to testify as witnesses. Moreover, many of the exhibits offered as evidence by the Trustee's counsel at the Hearing were matters of public record; they were pleadings filed either in this Court or in the United States District Court for the Eastern District of Louisiana. Finally, the Court notes that it provided Equipment and Cahaba with the opportunity to take several days after the Hearing to review the exhibits with which they were concerned and to submit any evidentiary objections they believed to be necessary. Two objections were eventually submitted jointly by Equipment and Cahaba, and these objections are addressed herein.

the end of the Hearing, in response to the renewed objections of counsel for Equipment during the Hearing, the Court asked counsel for Equipment and Cahaba to specifically identify any exhibits[4] that they needed additional time to review. Equipment identified Trustee Exhibits 2, 6 and 7; Cahaba did not independently identify any exhibits. Accordingly, the Court granted Equipment and Cahaba until 5:00 p.m. on Monday, June 27, 2011, to review Trustee Exhibits 2, 6 and 7 and file any evidentiary objections. Subsequently, Equipment filed objections to Trustee Exhibits 2 and 7, but withdrew its objection as to Trustee Exhibit 6 (Dkt. No. 38); Cahaba joined Equipment in these actions (Dkt. No. 41). The Trustee filed a response to the objections (Dkt. No. 43). For the reasons discussed below, the Court **OVERRULES** the Defendants' objections to Trustee Exhibits 2 and 7.

## I. BACKGROUND

### A. Introduction

On August 10, 2010, Equipment filed suit in the United States District Court for the Eastern District of Louisiana (the "Louisiana District Court") in New Orleans, Louisiana, asserting that Interstate Truck and Equipment, Inc. ("Interstate") (sometimes referred to in the Louisiana District Court pleadings as "Three Deuces")[5] was in possession of a barge, identified as Barge CGB-68017, which rightfully belonged to Equipment. See Equipment Leasing, LLC v. Three Deuces, Inc., No. 10-2628 (filed 8/10/2010). [6] (hereinafter referred to as the "Louisiana

---

[4]Citations to exhibits submitted at the Hearing are noted as follows: Trustee Ex. _____ or Equipment Ex. ___.

[5]The district court noted in a recent opinion that in the initial stages of the Louisiana action, Interstate was incorrectly identified as Three Deuces, Inc. See Equipment Leasing, LLC v. Three Deuces, Inc., No. 10-2628, 2011 WL 1326931, at *1 (E.D. La. April 1, 2011).

[6]Citations to the docket of the Louisiana action will be noted herein as follows: (La. Dkt. No. _____ ).

action"). Interstate avers that it bought Barge CGB-68017 from J.A.H. Enterprises Inc., d/b/a Henderson Auctions ("Henderson"), which in turn bought it free and clear of all pre-existing, competing interests at an auction that was authorized by this Court and conducted by Taylor Auction on October 15, 2009, (the "CDP Auction") in connection with the bankruptcy case of CDP Corporation, Inc. ("CDP"), a case which is still active and pending in this Court. See In re CDP Corporation, Inc., Case No. 09-50745-KMS (Bankr. S.D. Miss) (filed 4/13/2009).[7] Interstate levied a third-party claim against Henderson and Taylor for any damages that it may incur in the Louisiana action. Taylor, in turn, made demand on the Trustee for indemnification for all costs incurred and damages paid in the Louisiana action.

Assuming Barge CGB-68017 was part of the estate and/or was sold at the CDP Auction, the Trustee filed this adversary proceeding,[8] arguing that this Court retains jurisdiction to interpret and evaluate the effect of the order it entered authorizing the sale of the barge, and that this Court, through various statutory and inherent powers, can and should enjoin either the Louisiana District Court and/or the Defendants from proceeding with the Louisiana action. Assuming Barge CGB-68017 was never part of CDP's bankruptcy estate and/or was never sold at the CDP Auction, Equipment argues that the question concerning the proper ownership of Barge CGB-68017 must be decided in the Louisiana District Court, and that this Court has no jurisdiction to decide this issue.

---

[7]Citations to the docket in CDP's bankruptcy case will be noted hereinafter as follows: (Bankr. Dkt. No. ____ ).

[8]Citations to the docket in this adversary proceeding will be noted herein as follows: (Dkt. No. ____ ).

**B. Facts And Procedural History**

Prior to filing bankruptcy, CDP was in the debris removal business. Its owner and operator was Calvin Wesley Parker ("Parker"). (Dkt. No. 5 at 3). The relationship of the parties to this action is as follows.  Cahaba contracted CDP for certain projects.  (Dkt. No. 27 at 4). Equipment is a wholly owned subsidiary of DRC Emergency Services ("DRC"), and DRC is frequently contracted by Cahaba for various projects Id. at 14.

On April 13, 2009, CDP filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (Bankr. Dkt. No. 1). CDP's Chapter 11 case was converted to a Chapter 7 liquidation on July 23, 2009. (Bankr. Dkt. No. 115). As noted previously, Ms. Lentz is the Chapter 7 Trustee appointed to administer CDP's bankruptcy case.

The Trustee testified that her chief concern at the outset of her appointment was to locate all of the equipment in CDP's possession.[9] Accordingly, on the day of the conversion of CDP's bankruptcy case from a Chapter 11 to a Chapter 7 case, the Trustee arranged to have CDP's owner/operator, Parker, drive with her to each location where CDP had stored equipment. According to the Motion, CDP's equipment was secured at three locations: (1) the CDP Main Office located at 4040 Highway 90, Waveland, Mississippi; (2) 52782 Old Highway 90, Rigolets, Mississippi (the "Rigolets location"), and; (3) Road 374, Kiln, Mississippi. The Trustee testified that during the visit to each location, Parker identified each item in CDP's possession and "very clear[ly]" stated which pieces of equipment "he thought" belonged to CDP and which equipment belonged to someone else. In the Trustee's estimation, Parker appeared very confident and assured in rendering these assessments. On the day of conversion, the Trustee also evaluated

---

[9]To emphasize the number of items at issue, the Trustee explained that over 500 separate items were ultimately sold at the CDP Auction, and a number of these assets were large pieces of equipment.

CDP's principal place of business, which consisted of one or two trailers in Waveland, Mississippi. An examination of the contents of the trailer(s) showed that CDP did not appear to have any sophisticated internal accounting systems to track income and/or expenses; however, CDP did have what the Trustee described as a fairly impressive set of "equipment files," which the Trustee immediately seized and independently reviewed.

According to the Trustee, the barge depicted in the photograph labeled Trustee Exhibit 5 at the Hearing (the "T.E. 5 barge") was at the Rigolets location.[10]  There were also seven other barges in the immediate area surrounding the T.E. 5 barge. The Trustee stated that the T.E. 5 barge was "completely different" from the barges surrounding it, specifically it was "bigger" and it was a "different color." The Trustee testified that when she and Parker toured the Rigolets location, he informed her that the T.E. 5 barge and the seven other barges were the property of CDP. Even after reviewing the equipment files, the Trustee stated that "I had no reason not to believe that all the barges there belonged to CDP."

Shortly after her appointment, the Trustee was contacted by a number of parties regarding equipment in CDP's possession. Cahaba's counsel, McNamara, was one of the individuals who contacted the Trustee.  In a letter addressed to the Trustee and counsel for CDP, dated July 30, 2009, McNamara stated:

> As a follow up to the phone conversations I have had with both of you, this letter further communicates the intention of Cahaba Disaster Recovery, LLC (Cahaba) to take possession of its equipment that is now in possession of CDP Corporation, Inc. (CDP). I am writing this letter not only on behalf of my client, Cahaba, but also on behalf of Equipment Leasing, LLC (Equipment Leasing), who also owns a piece of equipment in

---

[10]The Trustee described the Rigolets location as a very swampy area with a small dock on the border between Mississippi and Louisiana.

CDP's possession. Equipment Leasing and DRC Inc. have authorized my firm and/or Cahaba to take possession of equipment on their behalf.

(Trustee Ex. 1 at 1). The letter lists six specific pieces of equipment in CDP's possession that Cahaba claimed to own and one piece of equipment in CDP's possession that Equipment claimed to own, a 2006 Peterbuilt 379TM Tractor. See id. at 1-2. In the letter, McNamara expressed the need to coordinate retrieval of the equipment described therein as soon as possible.[11]

In response to McNamara's representations, the Trustee testified that she worked with McNamara and representatives of Equipment and Cahaba to return the equipment/property noted in their communications. See also Trustee Ex. 2.  However, according to the Trustee, neither McNamara nor his firm, Adams and Reese, nor any other representatives of Cahaba or Equipment, nor any individual/entity other than Parker, on behalf of CDP, asserted any ownership interest in the T.E. 5 barge at any time prior to the CDP Auction.

On August 21, 2009, the Trustee filed an application with the Court to employ Benny Taylor/Taylor Auction as an Appraiser/Auctioneer to assist her in liquidating CDP's bankruptcy

---

[11] An email from McNamara to the Trustee on July 30, 2009, states:

> [Kimberly:] Please see the attached letter. The letter identifies the equipment owned by my client, Cahaba Disaster Recovery, LLC, or Equipment Leasing, LLC, and in possession of CDP. Equipment Leasing has given Cahaba and my firm authority to act on its behalf in retrieving its equipment. Attached to the letter is supporting documentation of this ownership. Besides the obvious need for Cahaba and Equipment Leasing to obtain possession of their equipment, they continue to be faced with the risk of unauthorized use and deterioration of their equipment while in CDP's possession. We need to act quickly in retrieval of this equipment.

(Trustee Ex. 2 at 6).  Another email from McNamara to the Trustee, dated August 14, 2009, further confirms that McNamara's firm had been "retained by both Cahaba and Equipment Leasing to retrieve their collateral."  (Trustee Ex. 2 at 18).

estate. (Bankr. Dkt. No. 147). The Court approved the employment application on August 26, 2009. (Bankr. Dkt. No. 156).[12]

The Trustee testified that after the representatives of Cahaba and Equipment retrieved the equipment/property to which they had laid claim from the Rigolets location, she traveled with Taylor and Parker to that location to begin to construct an official inventory of the remaining property in preparation for the upcoming CDP Auction. The Trustee stated that at the time of this follow-up visit, all eight barges that the Trustee had observed on her first visit to the Rigolets location were still there, including the T.E. 5 barge. Taylor similarly testified that when he entered the Rigolets location there were seven barges in the area immediately surrounding the T.E. 5 barge. Taylor stated that one of the seven surrounding barges was a spud barge that was dry docked - it was resting on a saw-horse like structure on dry land with the bottom cut out- and the remaining six barges were interlinked Poseidon barges.[13] Like the Trustee, Taylor testified that the T.E. 5 barge was very different from the Poseidon barges floating next to it. It was much larger than the other barges, it did not interlink with the others and it did not have the Poseidon logo on its side. Taylor also testified that he knew from its appearance that the T.E. 5 barge was a spud barge, whereas the six other barges in the water were not.[14] On cross-examination, Taylor

---

[12]Taylor testified that he is a certified auctioneer in the state of Mississippi, that he has been an auctioneer for the past twenty-eight years and that he has been an appraiser for the past twenty-two or twenty-three years.

[13]According to Equipment, Poseidon barges are manufactured by the Poseidon Barge Company and are generally a maroon color with the word "Poseidon" written on the side of the barges. (Dkt. No. 27 at 7).

[14]"A spud barge is a flat-decked floating structure that has devices similar to legs, called spuds, which are lowered from underneath the barge and pushed into the waterway floor to anchor the structure in place." Hurst v. Pilings & Structures, Inc., 896 F.2d 504, 506 (11th Cir. 1990).

stated that other than the T.E. 5 barge and the dry-docked spud barge, there were no other spud barges in the channel at the Rigolets location where the T.E. 5 barge was moored.

In accord with Parker's and the Trustee's representations that the T.E. 5 barge belonged to CDP, Taylor testified that the T.E. 5 barge was photographed, measured and marked for sale at the CDP Auction. Specifically, Taylor testified that he took the picture admitted into evidence as Trustee Exhibit 5.[15] Taylor also stated that the CDP Auction lot number assigned to the T.E. 5 barge, 572, was written in yellow crayon on the barge at a size that Taylor deemed sufficient so that potential buyers could identify the lot while conducting inspections at the Rigolets location prior to the CDP Auction. Each of the six interlinking Poseidon barges next to the T.E. 5 barge were also similarly assigned individual lot numbers and marked. Taylor explained that to take the measurements of the T.E. 5 barge he jumped from an adjacent Poseidon barge to the T.E. 5 barge and then "stepped it off . . . like the referee steps off the ten yard penalty" in order to approximate the width and length of the barge.  He did not use a tape measure.

During the course of the Hearing, counsel for Equipment noted that the measurements used to describe the T.E. 5 barge in the CDP Auction brochure and the auction invoice issued to Henderson are different, and that both of these measurements differ from the measurements of Barge CGB-68017 as calculated by a marine survey.  Specifically, the CDP Auction brochure described the eight barges in CDP's possession as follows:

    BARGES:

    • (6) Poseidon 20' x 10' x 5'
    • (1) Poseidon 40' x 10' x 5' Spud
    • (1) Poseidon 40' x 10' x 5'

---

[15]In order to take the photograph, Taylor testified that he had to walk up a cross walk/gangplank, step onto the six Poseidon interlinking barges, turn around and photograph the T.E. 5 barge.

(Equipment Ex. 1). In contrast, the auction invoice issued to Henderson described lot 572 as a "POSEIDON SPUD BARGE 24' x 73' x 8.'" (Equipment Ex. 2). Equipment's marine survey of Barge CGB-68017 states that Barge CGB-68017 is a spud barge measuring 68' in length, 26' in width and 7' in depth. (Dkt. No. 27, Ex. N). The Trustee testified that she believed that the cited discrepancies in the auction materials were clerical errors and that the T.E. 5 barge and Barge CGB-68017 are the same vessel. Taylor similarly stated that despite the measurement discrepancies noted above he believed that the Louisiana action concerned the T.E. 5 barge and that he simply erred in the measurements he used to describe the T.E. 5 barge in the CDP Auction brochure[16] and on Henderson's CDP Auction invoice.

On August 25, 2009, the Trustee filed a motion seeking authorization to sell substantially all of CDP's assets free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. §§ 105 and 363. (Bankr. Dkt. No. 151). On September 22, 2009, this Court entered an order granting authorization to the Trustee:

> [T]o conduct a public auction for the sale of substantially all personal property assets of [CDP's] estate free and clear of all liens, claims, interests and encumbrances

(Bankr. Dkt. No. 185) (referred to herein as the "sale order").

---

[16]During cross examination, counsel for Equipment asked Taylor why Taylor did not take a picture of the T.E. 5 barge's specification number/serial number, i.e., the equivalent of CGB-68017. Counsel argued that the appropriate number would have been marked in a visible place on the vessel. Taylor stated that he thought such a number would have been located on the hull of the vessel. However, Taylor testified that when he looked for an identification number on the T.E. 5 barge he could not find one.

Taylor stated that leading up to the CDP Auction, qualified bidders had the opportunity to conduct an on-site inspection of the items for sale.[17] According to Taylor, several individuals took advantage of this opportunity and inspected the eight barges discussed herein.

The CDP Auction was held on October 14th and 15th of 2009. On the first day of the auction, Taylor testified that the smaller items were liquidated. On the second day, Taylor convened approximately 400 potential bidders in a ballroom at a hotel to liquidate the larger items. Taylor facilitated the auction sales by narrating a PowerPoint presentation of his design. As he described each property and managed bidding, photographs of each piece of property were displayed on a large screen one at a time along with the corresponding lot number. The presentation was also simulcast on an internet auction website.

Taylor testified that sometime before the second day of the CDP Auction, Parker informed him that the T.E. 5 barge was misidentified in the marketing materials; specifically that it was incorrectly identified as a Poseidon barge. Taylor made notes in his presentation materials accordingly. Thus, on the second day of the auction, when the time came to sell lot 572, the photograph labeled Trustee Exhibit 5 was projected onto the screen in the ballroom and on the internet auction website and Taylor paused to notify the auction participants of the error. Taylor testified that he emphasized to the audience that lot 572 was a spud barge, not a Poseidon barge, and that descriptions stating otherwise in any document related to the CDP Auction were incorrect.[18]

---

[17]Taylor testified that Equipment was a qualified bidder for the CDP Auction.

[18]At the Hearing, Taylor read the disclaimer on the brochure advertising the CDP Auction, which, in pertinent part, states:
> ALL ANNOUNCEMENTS MADE DAY OF AUCTION TAKE PRECEDENCE OVER ANY AND ALL PREVIOUS ADVERTISEMENTS!

Taylor stated that he sold the barge depicted in Trustee Exhibit 5, which was designated lot 572, to Henderson.  Equipment's representative at the CDP Auction placed an unsuccessful bid on the T.E. 5 barge, but successfully purchased the six Poseidon barges that were adjacent to the T.E. 5 barge at the Rigolets location. The Court also notes that it appears that Henderson purchased the last of the eight barges located at the Rigolets location, the previously mentioned dry-docked, spud barge.[19]

Henderson's auction invoice described lot 572 as a "POSEIDON SPUD BARGE 24' x 73' x 8'" and states that this lot sold for $32,000. (Equipment Ex. 2). On cross-examination, Taylor stated that, given the time pressures, he did not correct Henderson's invoice to match the verbal corrections he made during the sale of lot 572, i.e., he did not remove the name Poseidon from the description of lot 572.

Taylor testified that after the auction, he saw Equipment pick up the six Poseidon barges from the Rigolets location.  At that time, the T.E. 5 barge was still moored in the waterway next to the Poseidon barges.

On August 10, 2010, nearly ten months after Taylor sold the T.E. 5 barge at the CDP Auction, Equipment filed the Louisiana action seeking to regain possession of Barge CGB-68017, which it alleged it owned and which it alleged was wrongfully in the possession of

---

(Equipment Ex. 1 at 1). Taylor testified that this is a standard provision that he places in all of his advertisements, and that most auctioneers employ this same form of disclaimer in their advertisements.

[19]Only eight barges were advertised in the auction brochure for the CDP bankruptcy auction. (Equipment Ex. 1 at 2). Additionally, the testimony presented at the Hearing consistently noted that there were eight barges at the Rigolets location that were marked for sale at the auction. The record establishes that Equipment purchased the six, interlinked Poseidon barges and that Henderson purchased the T.E. 5 barge. The invoice issued to Henderson post-auction shows that it also purchased another barge, labeled as lot 573 and described as a Poseidon barge, measuring 50' x 20' x 5'. (Equipment Ex. 2).

Interstate. (Dkt. No. 1, Ex. A). On February 16, 2011, Interstate filed a third party demand in which it alleged that it purchased Barge CGB-68017 at an auction conducted by Henderson. Id., Ex. C. Interstate further alleged that Henderson purchased Barge CGB-68017 from the CDP Auction conducted by Taylor. Accordingly, Interstate averred that if it was not lawfully in possession of Barge CGB-68017, then Henderson and Taylor are liable to Interstate for any and all damages which Interstate may incur due to the alleged unlawful possession of that barge. Id., Ex. C. In response, Taylor made a formal demand on the Trustee on May 18, 2011, for indemnification for damages and/or expenses arising out of the Louisiana action pursuant to the terms of the contract executed by the Trustee and Taylor in regard to the CDP Auction. Id., Ex. D.

On May 26, 2011, the Trustee filed the instant adversary case against Equipment and Cahaba. In this adversary, the Trustee seeks a declaratory judgment establishing that the Defendants have no interest in Barge CGB-68017 since it was sold free and clear of all interests by the order of this Court. The Trustee also requests that this Court, through its statutory and/or inherent powers, permanently stay and or enjoin the proceedings in the Louisiana District Court, hold the Defendants in civil contempt and impose sanctions on the Defendants. Finally, the Trustee seeks to extend the automatic stay of 11 U.S.C. § 362 to protect third-party, non-debtor Taylor Auction. (Dkt. No. 1).

On June 10, 2011, the Trustee filed the instant "Emergency Motion" seeking: (1) to preliminarily enjoin the Louisiana District Court from further adjudicating issues related to the Louisiana action and/or Barge CGB-68017, (2) to preliminarily enjoin the parties from further

litigation in the Louisiana District Court regarding CGB-68017, and (3) a declaration that the automatic stay of 11 U.S.C. § 362 protects Taylor/Taylor Auctions. (Dkt. No. 5 at 13, 15-16).

As between the Defendants in the instant adversary matter, Equipment is the only entity that argues it presently owns Barge CGB-68017. Cahaba argues that it has no ownership interest in Barge CGB-68017 and joins Equipment in making the assertion that Equipment owns Barge CGB-68017. Cahaba avers that it was brought into this action due to a series of miscommunications with the Trustee and submits that it has no standing to offer substantive arguments in this matter.[20]

Equipment asserts several arguments in response to the Trustee's Motion. First Equipment states that the description of the barge on Henderson's invoice from the CDP Auction does not accurately describe Barge CGB-68017. Specifically, Equipment notes that the auction invoice states that Henderson purchased a Poseidon barge, and that Barge CGB-68017 is not a Poseidon barge according to a marine survey of the vessel. (Dkt. No. 27, Ex. N). Furthermore, Equipment notes that the dimensions of the barge identified on Henderson's auction invoice as lot 572 do not match the measurements of Barge CGB-68017 that were obtained via the marine survey. Based on these observations, Equipment states, "there is no evidence that Barge CGB-68017 was sold to any party at the bankruptcy auction." (Dkt. No. 27 at 9).

Equipment also argues that if Barge CGB-68017 was somehow sold at the CDP Auction, the lack of advertisements accurately describing Barge CGB-68017 prior to the CDP Auction invoke Constitutional, Due Process concerns and negate the sale and any argument that

---

[20]Cahaba has filed a Motion to Dismiss arguing that it has no ownership interest in Barge CGB-68017 and was mistakenly brought into this action as a defendant. (Dkt. No. 39). This motion is set for hearing on August 2, 2011. (Dkt. No. 40).

Equipment implicitly consented to the sale vis-à-vis 11 U.S.C. § 363(f). See 11 U.S.C. § 363(f) (stating, in relevant part, that the trustee may only sell property free and clear of another entity's interest if that entity consents). Finally, Equipment urges that Barge CGB-68017 was never part of the CDP bankruptcy estate, and thus Barge CGB-68017 was not properly subject to sale in the CDP Auction and is not subject to the jurisdiction of this Court in the context of the present Motion. In support of these last arguments, Equipment has produced a contract of sale between Matthew's Marine and Equipment regarding Barge CGB-68017 dated November 21, 2006, along with affidavits and other documentation generally illustrating that Equipment insured Barge CGB-68017 from November 2006 thru June of 2008 and from January of 2010 thru January of 2011. (Dkt. No. 27, Exs. B (Affidavit of Erika Hunt stating Equipment insured CGB-68017 from 11/2006 – 6/2/2008) and I (insurance policy declaration stating Equipment and DRC insured CGB-68017 from 1/28/2010 thru 1/28/2011)); Cf. (Dkt. No. 28, Ex. 2) (an unsigned bill of sale concerning CGB-68017 between Matthew's Marine Inc. and Equipment); (Dkt. No. 1, Ex. A, sub-Ex. F) (Letter from Matthew's Marine noting "CDP West LLC" paid a $2,000 deposit on "CG Barge"); (Dkt. No. 1, Ex. A, sub-Ex. D) (a check from Cahaba to Matthew's Marine paying the balance due for sale of Barge CGB-68017 with the notation "CW Equipment Loan").[21]

---

[21]The Trustee alleges that the "CW" on the Cahaba check noted above refers to Calvin Wesley Parker, the owner and operator of CDP. (Dkt. No. 5 at 3, ¶ 11). The Trustee further alleges that the notation indicates that the parties intended that CDP would be the owner of Barge CGB-68017. Equipment asserts, and Cahaba confirms, that it paid Cahaba back in full for tendering this check to Matthew's Marine. (Dkt. No. 28 at 5). Equipment further argues that this reimbursement, combined with the contract of sale mentioned above, the fact that it insured Barge CGB-68017 for several years and the fact that its records show that an individual checked out Barge CGB-68017 from Equipment on CDP's behalf prove that Equipment and not CDP was and is the owner of Barge CGB-68017.

Equipment also attached a vehicle sign out sheet to its response which appears to show that an individual checked-out or signed-out Barge CGB-68017 from Equipment's[22] inventory on CDP's behalf. (Dkt. No. 27, Ex. H). Equipment asserts that this form is supplementary proof that Equipment, not CDP, was/is the owner of Barge CGB-68017. The sign-out form is dated November 30, 2006, just days after the contract of sale was executed between Equipment and Matthews Marine. The Court also notes that the sign-out form does not indicate that Barge CGB-68017 was ever returned to Equipment.

## II. JURISDICTION

The cases are numerous which find that "[a] bankruptcy court always retains jurisdiction to review and interpret its own orders." Rodriguez v. EMC Mortgage Corp. (In re Rodriquez), 252 F.3d 435, 2001 WL 360713, at *2 (5th Cir. 2001) (quoting In re Terracor, 86 B.R. 671, 677 (D. Utah 1988)); In re Cano, 410 B.R. 506, 546 (Bankr. S.D. Tex 2009) (quoting Travelers Indem. Co. v. Bailey, -- U.S. --, 129 S.Ct. 2195, 2205 (2009)). This continuing jurisdiction is core jurisdiction. In re Petrie Retail, Inc., 304 F. 3d 223, 230-31 (2d Cir. 2002) (core jurisdiction existed over dispute regarding interpretation of bankruptcy court's sale order); In re Portrait Corp. of America., Inc., 406 B.R. 637, 641 (Bankr. S.D.N.Y. 2009). Likewise, "injunctive authority of the bankruptcy courts [is] 'core' when the rights sought to be enforced by injunction are based on provisions of the Bankruptcy Code, such as the 'free and clear'

---

[22]The form itself does not clearly denote from whose inventory the Barge was released. The form has the following header: "DRC Emergency Services, LLC Vehicle Sign Out Sheet." (Dkt. No. 27, Ex. H). As stated previously herein, DRC is Equipment's parent company. The form notes that the vehicle released was "1964 Barge 'CGB-68017,'" and that this barge was released by "Erika Hunt." Id. The Affidavit of Erica Hunt indicates that although the sign out form is a DRC form, Barge CGB-68017 was checked out from Equipment's inventory. (Dkt. No. 27, Ex. B). The Court notes that no one has addressed whether the individual who allegedly signed for the barge on behalf of CDP, Bryce Fletcher, was actually an employee or authorized agent of CDP.

authority of section 363(f)."  In re Motors Liquidation Co., 428 B.R. 43, 56 (Bankr. S.D.N.Y. 2010).

### III. LAW & ANALYSIS

As noted above, in the instant Motion the Trustee requests: (1) that this Court preliminarily enjoin the Louisiana District Court from further adjudicating issues related to the Louisiana action and/or Barge CGB-68017, or (2) that this Court preliminarily enjoin the parties from further litigation in the Louisiana District Court regarding Barge CGB-68017 "pending transfer and referral of the [Louisiana action] to [this Court],"[23] and (3) that this Court issue a declaration that the automatic stay imposed by 11 U.S.C. § 362(a) protects Taylor/Taylor Auctions. (Dkt. No. 5 at 13, 15-16). These requests will be addressed below.

**A. The Trustee's Request That This Court Enjoin The Louisiana District Court**

This Court cannot envision a situation in which it would attempt to enjoin a federal district court; and the Trustee has not provided any persuasive authority for such an action.  The Trustee argues that this Court has the authority to enjoin the Louisiana District Court from continuing to consider the suit concerning Barge CGB-68017 pursuant to its "Inherent General Equity Powers" as construed in the Fifth Circuit's decision in Wedgeworth v. Fibreboard Corp., 706 F.2d 541, 545 (5th Cir. 1983). However, the *Wedgeworth* decision does not directly address the authority of the bankruptcy courts, but instead addresses the inherent, general, discretionary power of the federal *district* courts. More importantly, to the extent that *Wedgeworth* can be construed to apply to bankruptcy courts, its holding does little to address the substance of the

---

[23]The only way that the Trustee can effectively achieve transfer and/or referral is by seeking relief in the Louisiana District Court.

Trustee's request.[24]  *Wedgeworth* addresses a court's inherent power to control its own docket, including the power to stay proceedings that are properly before it. Here, the Trustee has requested that this Court exert authority directly over another court, a far different proposition.

The Trustee also suggests that this Court has authority under 11 U.S.C. § 105(a) to directly enjoin the Louisiana District Court. Section 105(a) of Title 11, utilizing well known, oft cited terminology, states:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). The Fifth Circuit has cautioned bankruptcy courts that the power granted by 11 U.S.C. § 105(a) is not limitless. See Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.), 378 F.3d 511, 523 (5th Cir. 2004); Omni Mfg., Inc. v. Smith (In re Smith), 21 F.3d 660, 665 (5th Cir. 1994); Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1116 (5th Cir. 1995). While the Trustee has cited authorities that generally discuss the broad injunction power of the bankruptcy court under Section 105(a), she has not cited authority from within the Fifth Circuit that explicitly states, or more importantly demonstrates, that this Court has the

---

[24]In *Wedgeworth*, the Fifth Circuit was asked to review the decisions made by several federal district courts in regard to stay requests. Several asbestos-related cases involving some of the same parties had been filed in various venues and one of the co-defendants in these actions had declared bankruptcy. The remaining co-defendants asserted that they were entitled to a stay of the cases against them until the co-defendant's bankruptcy was properly concluded. Some of the lower courts exercised their inherent, discretionary power over their own docket to stay proceedings against the co-defendants, while other courts did not. In *Wedgeworth*, the Fifth Circuit sought to establish certain uniform principles to help district courts better determine when it is appropriate to exert their inherent power to stay cases on their own docket. See Wedgeworth, 706 F.2d 541; see also In re Beebe, No. 95-20244, 1995 WL 337666, at *2 and n.10 (5th Cir. May 15, 1995) (citing *Wedgeworth* in context of discussion regarding district court's authority to control its own docket); Morris v. Wyeth, Inc., No. 09-0854, 2011 WL 311009, at *1 (W.D. La. Jan. 27, 2011) (citing *Wedgeworth* for the proposition that a court has authority to control its own docket).

authority to directly enjoin a federal district court.[25] See 1 Collier on Bankruptcy ¶ 3.09, at 3-90.1 (Alan N. Resnick & Henry J. Sommer, 16th ed., updates through March 2011) (discussing power of bankruptcy court to enjoin state courts and recognizing that "*[w]hether a non-Article III court will be held by Article III courts to have the power to enjoin Article III courts is another matter altogether*") (emphasis added).

In the absence of binding authority explicitly empowering this Court to directly enjoin an Article III court, this Court will not do so. For the reasons stated above, the Trustee's Motion is denied to the extent that it is requesting that this Court stay the Louisiana District Court.

## B. The Trustee's Request That This Court Enjoin The Parties From Further Litigation In The Louisiana District Court

The Trustee proposes that this Court enjoin the parties from further litigation before the Louisiana District Court under the same authorities discussed above, i.e., the *Wedgeworth* decision and 11 U.S.C. § 105(a).[26] The Louisiana action was brought by Equipment against

---

[25]The Trustee has cited In re Johns-Manville Corp., 26 B.R. 420, 425 (Bankr. S.D.N.Y. 1983), in support of her argument. In pertinent part, the *Johns-Manville* Court stated that:

> A bankruptcy court may use its equitable powers to issue injunctive relief against proceedings in other courts when the bankruptcy court is satisfied that such a proceeding would either defeat or impair its jurisdiction with respect to a case before it.
>
> * * *
>
> The court [has] ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process whether in a liquidation or in a reorganization case.

Id. (in part, quoting 2 Collier on Bankruptcy ¶ 362.05 (15th ed. 1982)). After making this broad statement, the *Johns-Manville* court proceeded to stay certain actions in various courts that hindered the Chapter 11 bankruptcy reorganization proceeding that was pending before it. The Court does not find *Johns-Manville* persuasive in this case.

[26] As explained above, *Wedgeworth* is not applicable in these proceedings. Therefore, the analysis will focus on injunctions issued under 11 U.S.C. § 105(a).

Interstate, and Interstate has now levied a third party claim against Henderson and Taylor. Because Equipment, Interstate and Henderson are not parties to the CDP bankruptcy, the lawsuit pending in the Louisiana District Court between these parties is a "third-party action" for purposes of this Court's analysis. Feld v. Zale Corp. (In re Zale Corp.), 62 F.3d 746, 751 (5th Cir. 1995).

As the Fifth Circuit itself has stated, "[v]ery little Fifth Circuit case law exists concerning injunctions issued by a bankruptcy court to [temporarily or permanently] bar claims between nondebtor third parties." In re Zale Corp., 62 F.3d at 751 n.14. However, the Fifth Circuit has held that a bankruptcy court may temporarily stay actions against a nondebtor under 11 U.S.C. § 105(a) under "unusual circumstances." Reuther v. Smith, No. 06-6612, 2007 WL 1962956, at *4 (E.D. La. June 29, 2007) (citing In re Zale Corp., 62 F.3d at 761). Under current Fifth Circuit law, "[s]tays under Section 105(a) are also subject to the usual rules for the issuance of an injunction under Federal Rule of Civil Procedure 65." Id. (citing Zale, supra, and In re Commonwealth Oil Refining Co., 805 F.2d 1175, 1188-89 (5th Cir. 1986)). "Accordingly, both 'unusual circumstances' and the pre-requisites to issuance of an injunction must be present for the Court to stay" Equipment from further participation in the Louisiana action. Id.

**1. Preliminary Injunction Factors**

The four prerequisites to the issuance of a preliminary injunction are: (a) a substantial likelihood that the movant will prevail on the merits; (b) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (c) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and (d) that the granting of the injunction will not disserve the public interest. See In

re Zale Corp., 62 F.3d at 765 (citing In re Commonwealth Oil Ref. Co. v. U.S.E.P.A. (In re

Commonwealth Oil Ref. Co.), 805 F.2d. 1175, 1189 (5th Cir. 1986)). It has been observed that:

> The Fifth Circuit employs a sliding scale when analyzing the
> degree of "success on the merits" a movant must demonstrate to
> justify injunctive relief. In re Hunt, 93 B.R. 484, 492
> (N.D.Tex.1988) ( citing Canal Authority v. Callaway, 489 F.2d
> 567, 576 (5th Cir.1974)). This involves "balancing the hardships
> associated with the issuance or denial of a preliminary injunction
> with the degree of likelihood of success on the merits." Id.
> (quoting Florida Medical Ass'n v. United States, 601 F.2d 199, 203
> n. 2 (5th Cir.1979)).

In re The Babcock & Wilcox Co., No. Civ-A-00-3408, 2001 WL 536305, at *7 (E.D. La. May

18, 2001); see also Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading, Co., 621 F.

2d 683, 686 (5th Cir.1980) ("Where the other factors are strong, a showing of some likelihood of

success on the merits will justify temporary injunctive relief.").[27] The four factors are addressed

below.

### (a.) Substantial Likelihood That The Trustee Will Prevail On The Merits

The eventual success or failure of the Trustee's various prayers for relief in this adversary

proceeding all hinge on one core determination: whether the T.E. 5 barge, i.e., the barge that was

marked as lot 572 and was sold to Henderson at the CDP Auction, is the same vessel as Barge

---

[27]The Court notes that "[i]n adapting the preliminary injunction standard to the bankruptcy context, some courts
reformulate, relax or even eliminate some of the traditional elements." Buke v. Eastburg (In re Eastburg), 440 B.R.
864, 872 (Bankr. D.N.M. 2010) (collecting cases). In particular, several courts have held that once a bankruptcy
court is satisfied that certain proceedings would defeat or impair its jurisdiction, a bankruptcy court may issue an
injunction under 11 U.S.C. § 105(a) without much, if any, further analysis. See Beck v. Fort James Corp. (In re
Crown Vantage, Inc.), 421 F.3d 963, 975-76 (9th Cir. 2005); In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir.
1991); In re L&S Indus., Inc., 989 F.2d 929, 932 (7th Cir. 1993). However, acknowledging the apparent lack of
Fifth Circuit law regarding injunctions that address a collateral attack of a bankruptcy court order, this Court will
apply the traditional preliminary injunction standards to the Trustee's request for injunctive relief, adapting those
factors to the special and unique circumstances of this case.

CGB-68017, the vessel at issue in the Louisiana action. The Trustee avers that barge she sold is the barge at issue in the Louisiana action. This Court will consider whether, at this preliminary stage of the proceedings, the record establishes that the Trustee is substantially likely to succeed in proving this allegation.

To demonstrate a likelihood of success on the merits, the Trustee is not required to present sufficient evidence to "prove [her] entitlement to summary judgment." Janvey v. Alguire, 628 F.3d 164, 175 (5th Cir. 2010). The Trustee must present a prima facie case, but "need not show that [she] is certain to win." Id.

Equipment has produced a "Sign Out Sheet" (Dkt. No. 27, Ex. H) that indicates that Barge CGB-68017 was checked-out from Equipment's inventory on November 30, 2006, to CDP. The space on this form designed to document the return of the barge is blank, indicating that Barge CGB-68017 had not been returned and was in CDP's possession when CDP filed bankruptcy on April 13, 2009. The documents filed in the Louisiana District Court establish that Barge CGB-68017 was in the possession of Interstate when the Louisiana action was filed on August 10, 2010. (Dkt. No. 1, Ex. A); (La. Dkt. Nos. 1, 4, 9 and 13) [28] (these documents include the warrant served for the arrest of the barge and the order authorizing the relocation of Barge CGB-68017 from the place Interstate had berthed/anchored it). Thus, the start point and the end point of Barge CGB-68017's journey over the past several years are established, and this Court is obliged to consider how these two points are connected.

---

[28] Under certain circumstances, a court may take judicial notice of publicly filed documents, particularly in prior, related proceedings, for limited purposes. See Airport Boulevard Apartments, Ltd. v. NE 40 Partners, Ltd. P'ship (In re NE 40 Partners, Ltd.), 411 B.R. 352, 362 n.7; Allstate Ins. Co. v. Estate of Robert M. Levesque, No. 8:08-cv-2253-T-33EAJ, 2010 WL 2978037, at *1 (M.D. Fla. July 19, 2010); Shurkin v. Golden State Vintners, Inc., No. C-04-3434-MJJ, 2005 WL 1926620, at *4-6 (N.D. Cal. Aug. 10, 2005).

The Court takes special notice of the fact that Interstate believes that Barge CGB-68017 came to it through Henderson and Taylor by way of the CDP Auction. Accordingly, Interstate has filed a third party complaint against Henderson and Taylor.

The evidence before this Court indicates that CDP had only eight barges in its possession by the time the final inventory for the CDP Auction was compiled. Considering the Equipment sign out form discussed above and the testimony at the Hearing, Barge CGB-68017 was likely among them. According to Taylor's testimony, of the eight barges in CDP's possession at the time of the CDP Auction, the six interlinked Poseidon barges were sold to Equipment. The remaining two barges were sold to Henderson. (Dkt. No. 27, Ex. K).

The measurements on Henderson's auction invoice for the T.E. 5 barge, i.e., lot 572, are not that different from the measurements of Barge CGB-68017 in the marine survey submitted by Equipment. The auction invoice notes that the T.E. 5 barge measured 24' x 73' x 8'. (Equipment Ex. 2). Equipment's marine survey states that Barge CGB-68017 measures 68' in length, 26' at its beam (width), and 7' in depth. (Dkt. No. 27, Ex. N). When considering that Taylor approximated the T.E. 5 barge measurement figures by using his feet rather than a measuring tape, the slight variation between the two measurements indicates that the T.E. 5 barge and Barge CGB-68017 are likely the same barge.

Furthermore, the chances that Henderson accidentally took possession of a barge other than the T.E. 5 barge are, by this Court's estimation, very low. Taylor testified that he wrote the CDP Auction lot number, 572, on the T.E. 5 barge with yellow crayon large enough for easy viewing, and that all the other barges sold were marked in a similar manner with their respective lot numbers. Taylor also testified that there were no other spud barges in the waterway where the

T.E. 5 barge was moored,[29] and that he had clearly announced at the CDP Auction that the T.E. 5 barge was a spud barge. Furthermore, a picture of the T.E. 5 barge was projected on screen(s) visible to the bidders at the time of the CDP Auction sale.

Certainly, as these proceedings move forward, the Court will expect further evidence to be introduced to verify the chain of title alleged by the Trustee, i.e., that the T.E. 5 barge was the barge Henderson took possession of through the bankruptcy auction and sold to Interstate, and that this same barge was the vessel that, most recently, was seized from Interstate via the Louisiana action. Similar to the Louisiana District Court, this Court believes that discovery from Henderson is critical in this regard. (La. Dkt. No. 50). However, in the Court's view, there is more than enough evidence currently in the record in this proceeding to justify a preliminary finding that the T.E. 5 barge and Barge CGB-68107 are one and the same.

Given the finding above, the Louisiana action appears to be a collateral attack[30] on this Court's order authorizing the sale, free and clear of preexisting interests, of the T.E. 5 barge/Barge CGB-68017.[31]   There is ample authority indicating that if Equipment wants to

---

[29]Taylor testified that the barge resting on sawhorses near the waterway was also a spud barge. The evidence indicates this dry-docked spud barge was also sold to Henderson. See supra note 19.

[30] A "[c]ollateral attack refers to the method of attempting to circumvent an earlier ruling by filing a subsequent action," usually in a court outside the normal chain of review of the court which issued the challenged ruling. Pratt v. Ventas, 273 B.R. 108, 114 (W.D. Ken. 2002). With the exception of proper appeals, an action is a collateral attack "if it must in some fashion overrule a previous judgment" of this court, for instance, this Court's order authorizing the sale of the T.E. 5 barge free and clear of preexisting interests. Hays v. McMillian, 418 F.Supp. 116, 120 (N.D. Tex. 1976) (citing Miller v. Meinhard-Commercial Corp., 462 F.2d 358 (5th Cir. 1972)).

[31]"An order issued by the bankruptcy court authorizing the sale of part of the bankrupt estate is a final judgment even though the order neither closes the bankruptcy case nor disposes of any claim." Hendrick v. Avent, 891 F.2d 583, 586 (5th Cir. 1990); see also In re Sax, 796 F.2d 994, 996 (7th Cir. 1986) (finding that "[o]rders approving . . . the sale of a debtor's property are considered final decisions and are immediately appealable"). Furthermore, the case law clearly establishes that if a bankruptcy court had jurisdiction to enter a sale order, then a collateral attack against such a sale order must be rejected. See Parker v. Goodman, 499 F.3d 616, 620 (6th Cir. 2007); Bronson v. CHC Indus., Inc., 389 B.R. 767, 774 (Bankr. M.D. Fla. 2007); Rosen v. Andresen, No. 01-25370-TJC, 2006 WL 4481984, at *8 (Bankr. D. Md. 2006).

challenge this Court's sale order, it should do so in this Court.  The Supreme Court's opinion in

Celotex Corporation v. Edwards is instructive on this account, explaining, in pertinent part, that:

> [I]t is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected. If respondents believed the [Bankruptcy Court's order] was improper, they should have challenged it in the Bankruptcy Court, like other similarly situated bonded judgment creditors have done. If dissatisfied with the Bankruptcy Court's ultimate decision, respondents can appeal to the district court for the judicial district in which the bankruptcy judge is serving, see 28 U.S.C. § 158(a), and then to the Court of Appeals for the Eleventh Circuit, see § 158(d). Respondents chose not to pursue this course of action, but instead to collaterally attack the Bankruptcy Court's [order] in the federal courts in Texas. This they cannot be permitted to do without seriously undercutting the orderly process of the law.

Celotex Corp. v. Edwards, 514 U.S. 300, 313, 115 S.Ct. 1493, 1501 (1995); see also Heck v.

Humphrey, 512 U.S. 477, 490 n.10, 114 S.Ct. 2364, 2374 (1994) (acknowledging that "the

principle barring collateral attacks" is "a longstanding and deeply rooted feature of both the

common law and [the Supreme Court's] own jurisprudence"). Accordingly, the Court finds there

is a substantial likelihood that the Trustee will succeed in establishing that the T.E. 5 barge and

Barge CGB-68107 are the same barge.

### (b.) Threat Of Irreparable Injury

In regard to irreparable injury, there are several concerns in this case. First, if

Equipment is allowed to continue to litigate the merits of the Louisiana action, the long-standing

judicial policy prohibiting collateral attacks will be violated, seriously undercutting the orderly

process of law. See Celotex Corp., 514 U.S. at 313, 115 S.Ct. at 1501; Henkel v. Lickman (In re

Lickman), 286 B.R. 821, 829-30 (Bankr. M.D. Fla. 2002) (collateral attack on the bankruptcy court's jurisdiction and orders in the courts of another jurisdiction, if allowed to continue, would result in irreparable harm to the bankruptcy policy of the United States).

Second, decisions rendered in the Louisiana action could limit this Court's review of its own sale order. See Altman v. Davis & Dingle Family Dentistry (In re EZ Pay Services, Inc.), 389 B.R. 751, 759-60 (Bankr. M.D. Fla. 2007) (finding potential collateral estoppel effect of parallel state court action on Trustee suit amounted to a showing of irreparable injury meriting an injunction). Additionally, the Louisiana action contravenes the statutory and judicial policy favoring the finality of judgments approving sales in bankruptcy, and as such threatens to generally decrease the value of the assets sold in bankruptcy. See Tucker v. First Commercial Bank NA, No. 99-40208, 2000 WL 122408, at *2 (5th Cir. Jan. 4, 2000). Potential buyers will likely discount the value assigned to assets purchased at bankruptcy sales if they believe they will be susceptible to suit in a foreign jurisdiction long after the sale has occurred.

Finally, this case could set a dangerous precedent for bankruptcy trustees. If this Court's sale orders are allowed to be challenged in foreign jurisdictions, the trustees may be compelled to defend against such claims and, consequently, it will be far more difficult and expensive for the trustees to administer bankruptcy cases. See Beck v. Fort James Corp. (In re Crown Vantage, Inc.), 421 F.3d 963, 974-75(9th Cir. 2005); In re Linton, 136 F.3d 544, 545 (7th Cir. 1998); In re Lickman, 286 B.R. at 830.  Considering the critical policy considerations at

stake in this case, the Court finds that there is a threat of irreparable harm which merits the issuance of a preliminary injunction.[32]

### (c.) Injunction Will Not Cause Harm

Equipment will not suffer harm if a preliminary injunction is entered prohibiting Equipment from prosecuting its claim in the Louisiana action for a limited period of time. Such an injunction does not impact the motion for summary judgment that is currently under advisement in the Louisiana District Court nor does it foreclose Equipment from bringing its arguments before this Court in the context of the present adversary proceeding. Additionally, insofar as Equipment's actions constitute a collateral attack of this Court's sale order, Equipment

---

[32]The Court notes that the Louisiana action will undoubtedly have a direct, adverse impact on the ongoing CDP bankruptcy proceeding. Attached to this Court's Order On Trustee's Application To Employ Appraiser/Auctioneer (Bankr. Dkt. No. 156), is the "Absolute Auction Contract" executed between the Trustee and Taylor. Under this agreement, the Trustee, with Court approval, agreed to:

> [R]elease and covenant to hold harmless auctioneer and Auction company from any and all actions, causes of actions, claims, demands, damages, expenses, on account of or any way growing out of the handling of said auction herein mentioned.

(Bankr. Dkt. No. 156). Considering the terms of the above-quoted agreement and the third-party claim asserted against Taylor in the Louisiana action, Taylor tendered a letter to the Trustee on May 18, 2011, formally demanding that the Trustee indemnify Taylor for damages and/or expenses arising out of the Louisiana action. (Dkt. No. 1, Ex. D). As a result, the Trustee is currently incurring liability for litigation costs associated with the Louisiana action which, without more, will be passed on to CDP's bankruptcy estate. See generally 11 U.S.C. §§ 327, 328 and 330; accord Schechter v. Illinois (In re Markos Gurnee P'ship), 182 B.R. 211, 215 (Bankr. N.D. Ill. 1995) (explaining that generally when a litigious demand is made against the Trustee in her official capacity the trustee is not personally liable and any judgment against her is payable only out of the estate). Thus, the Louisiana action will have an ever-increasing, negative impact on CDP's liquidation proceeding since CDP's creditors will receive fewer assets to address CDP's outstanding debts. Courts have found injunctions against actions brought against third parties may be merited when the actions threaten to impact the bankruptcy case/estate via an indemnification agreement. See In re FairPoint Commc'ns, Inc., No. 11-Civ.-946-CM, 2011 WL 1533178, at *7-8 (slip copy) (citing In re El Paso Refinery, LP, 302 F.3d 343, 349 (5th Cir. 2002)) (noting that Fifth Circuit found bankruptcy court had jurisdiction to enjoin third party litigation that would set off a chain of indemnification provisions leading directly to the debtor and independently finding that a bankruptcy court has jurisdiction to issue an injunction against third party litigation when the bankruptcy estate may be obligated to indemnify party to that litigation); In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991) (citing In re A.H. Robbins Co., 880 F.2d 694, 701 (4th Cir. 1989)) (third party actions may be enjoined where they would affect the bankruptcy in one way or another such as by way of indemnity or contribution).

cannot claim it has been harmed by "a prohibition from doing that which [it] is not permitted to do in the first place." Henkel v. Lickman, 286 B.R. 821, 831 (M.D. Fla. 2002).

### (d.) Injunction Will Not Disserve Public Interest

This element requires a balancing of public interest with other competing social interests.  Id.  As set forth above, the policies underlying an orderly and effective judicial system would be well served by a preliminary injunction, and these interests outweigh any competing concerns in this case.

### 2. Unusual Circumstances

The Court has been unable to find a case in which the Fifth Circuit has addressed the issue of "unusual circumstances" in the context of an injunction related to a collateral attack on an order of a bankruptcy court.  However, other courts have recognized that such an attack presents the unusual circumstances necessary to warrant an injunction.  For example, the First Circuit has recognized the existence of "extraordinary" circumstances when:

> [W]hat is sought is a relitigation injunction. The justification for the injunction here is not effect on the debtor (although the presence of such an effect certainly strengthens the case for the injunction), but protection of a federal judgment. A valid original judgment provides the federal court with the power to issue the religation injunction.

In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991) (citations omitted); accord Central West Virginia Energy Co. v. Wheeling-Pittsburg Steel Corp., No. 06-3906, 2007 WL 1675004, at *11 (6th Cir. June 11, 2007) (recognizing bankruptcy courts have the jurisdiction and power under case law and 11 U.S.C. § 105(a) to issue injunctions as may be necessary or appropriate to effectuate or prevent the frustration of orders that they have previously issued).

As explained in the analysis of the preliminary injunction standards, the Louisiana action appears to be a collateral attack of this Court's sale order. As such, the collateral attack constitutes an "unusual circumstance" warranting an injunction in this case.

### 3. Conclusion

Having considered all of the required factors, this Court finds that a preliminary injunction should issue to stay Equipment from prosecution of the Louisiana action for a period of twenty-one days from the date of this order to allow the Trustee time to file such motion(s) in the Louisiana action as the Trustee deems appropriate or necessary in light of this opinion.

## C. The Trustee's Request To Extend The Automatic Stay To Taylor

In the Motion, the Trustee argues that this Court may "invoke and extend" the stay imposed under 11 U.S.C. § 362 to prohibit the Louisiana action insofar as Taylor is concerned. (Dkt. No. 5 at 13-14). In support of this proposition, the Trustee cites two Fifth Circuit cases. See Reliant Energy Servs., Inc. v. Enron Canada Corp., 349 F.3d 816, 825 (5th Cir. 2003); Arnold v. Garlock, Inc., 278 F.3d 426, 435-36 (5th Cir. 2001).[33] In these cases, the Fifth Circuit cautioned that "[s]ection 362 is rarely . . . a valid basis on which to stay actions against non-debtors." See Reliant Energy Servs., Inc., 349 F.3d at 825; Arnold, 278 F.3d at 436. However, as "an exception" to this general rule, the Fifth Circuit held that:

> a bankruptcy court may invoke § 362 to stay proceedings against nonbankrupt co-defendants where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-

---

[33]The Trustee has also cited several decisions from courts outside of the Fifth Circuit. Like the Fifth Circuit decisions discussed herein, the pertinent portions of these extra-Circuit opinions are based on the Fourth Circuit's decision in A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986), and/or are interpretations of 11 U.S.C. § 362(a)(1). Accordingly, the analysis above is also applicable to these non-binding authorities.

party defendant will in effect be a judgment or finding against the
debtor.

Reliant Energy Servs., Inc., 349 F.3d at 825 (internal quotations omitted) (in part, quoting A.H.
Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)); see also Arnold, 278 F.3d at 436
(similarly stating that as an exception to the general rule, a "bankruptcy court may invoke § 362
to stay proceedings against nonbankrupt co-defendants" under the aforementioned
circumstances) (also citing *A.H. Robins Co.*, *supra*).

> The Trustee notes that she executed an agreement with Taylor under which she agreed to:
>
>> [R]elease and covenant to hold harmless auctioneer and Auction
>> Company from any and all actions, causes of actions, claims,
>> demands, damages, expenses, on account of or any way growing
>> out of the handling of [the CDP Auction].

(Dkt. No. 5 at 14) (citing Bankr. Dkt. No. 156). Furthermore, the Trustee has received a formal
demand to indemnify Taylor/Taylor Auction for any costs and/or damages incurred through the
Louisiana action. (Dkt. No. 1, Ex. D). Considering these facts and the case law cited above, the
Trustee argues that "[t]he contractual obligation of the Trustee to provide absolute indemnity to
Taylor Auction is a formal tie between the Debtor and [Taylor Auction] . . . and an identity of
interest sufficient to extend the automatic stay provision of § 362 to Taylor Auction." (Dkt. No. 5
at 15).

The "automatic stay" of Section 362 has several distinct sub-parts.  See 11 U.S.C. §
362(a)(1)-(8). Thus, the Court has considered which of these sub-parts are extended under the
*Reliant* and *Arnold* decisions.  While these opinions do not explicitly answer this question, the
Court notes the *Reliant* and *Arnold* adopted the pertinent stay extension policy from the Fourth
Circuit's *A.H. Robins Co.* decision.  In fact, the Fifth Circuit referred to the subject extension of

the 362 stay as the "*A.H. Robins Co.'s* exception." <u>Reliant Energy Servs., Inc.</u>, 349 F.3d at 825.

The specific sub-part of Section 362 addressed in the *A.H. Robins Co.* decision is 11 U.S.C. §

362(a)(1). <u>See</u> <u>A.H. Robins Co., Inc.</u>, 788 F.2d at 998-999.

In full, Section 362(a)(1) provides that, subject to certain exceptions, the filing of a

bankruptcy petition operates as a stay, applicable to all entities, of:

> the commencement or continuation, including the issuance or
> employment of process, of a judicial, administrative, or other
> action or proceeding against the debtor that ***was or could have
> been commenced before the commencement of the case under
> this title***, or to recover a claim against the debtor ***that arose before
> the commencement of the case under this title***

11 U.S.C. § 362(a)(1) (emphasis added). Under the plain terms of this provision, the Section

362(a)(1) stay does not apply to lawsuits arising out of post-petition activity.  Accordingly, the

suit brought by Interstate against Taylor, arising out of post-petition activity, i.e., the CDP

Auction, is not stayed by Section 362(a)(1), or any judicial extension of that particular statutory

provision.

However, the Court notes that the claim against Taylor in the Louisiana action may

invoke issues regarding subject matter jurisdiction under the *Barton* doctrine. <u>See</u> <u>Barton v.</u>

<u>Barbour</u>, 104 U.S. 126, 26 L.Ed. 672 (1881). Under this doctrine, "a court appointed trustee

cannot be sued for actions taken in the trustee's official capacity unless leave is first obtained

from the court that appointed the trustee."  <u>In re WRT Energy Corp.</u>, 402 B.R. 717, 721-22

(Bankr. W.D. La. 2007)(setting out the history of the *Barton* doctrine and its applicability to

bankruptcy trustees). Courts have held that this doctrine applies to suits against auctioneers and

lawyers appointed by the trustee and approved by the court to represent the estate, reasoning that

when these auctioneers and lawyers act at the direction of the trustee for the purpose of

administering the estate or protecting its assets they are the "functional equivalent of a trustee." Carter v. Rogers, 220 F.3d 1249, 1252 n.4 (11th Cir. 2000); Allard v. Weitzman (In re DeLorean Motor Co.), 991 F.2d 1236, 1241(6th Cir. 1993). Considering this Court's denial of the motion to the enjoin the Louisiana District Court and considering that a motion for summary judgment is under advisement in the Louisiana action, it is incumbent upon Taylor and/or the Trustee to present any arguments they deem necessary and appropriate, including any potential *Barton* claims, to the Louisiana District Court.

**D. Outstanding Evidentiary Rulings**

As was noted at the outset of this opinion, at the conclusion of the Hearing, the Court asked counsel for Equipment and Cahaba to specifically identify any exhibits that they needed additional time to review. Equipment identified Trustee Exhibits 2, 6 and 7; Cahaba did not independently identify any exhibits.  The Court granted Equipment and Cahaba until 5:00 p.m. on Monday, June 27, 2011, to review Trustee Exhibits 2, 6 and 7 and file any necessary evidentiary objections. Subsequently, Equipment filed objections to Trustee Exhibits 2 and 7, but withdrew its objection as to Trustee Exhibit 6 (Dkt. No. 38); Cahaba joined Equipment in these actions (Dkt. No. 41). The Trustee filed a response to Equipment's and Cahaba's objections (Dkt. No. 43).  The Court will analyze the Defendants' objections below.

**1. Trustee Exhibit 2**

Trustee Exhibit 2 consists of 30 pages of email communications between the Trustee, McNamara, Hunter Fuzzell ("Fuzzell"), David Eblen ("Eblen") and Jeff Tyree, counsel for CDP, regarding the identification of equipment that was in CDP's possession that Cahaba or Equipment owned and the efforts of these individuals to coordinate the retrieval of said items

from CDP's possession on behalf of the alleged owners. The emails supplemented the testimony provided by the Trustee in open court.

The Defendants object to the admission of Trustee Exhibit 2, arguing that this exhibit is irrelevant and that this exhibit constitutes inadmissible hearsay. In regard to the hearsay objection, the Defendants specifically argue that:

> [T]he Trustee introduced Exhibit No. 2 to prove the truth of the matter asserted therein, namely that Equipment Leasing had notice that the Trustee intended to sell its Barge and that is [sic] had the opportunity to retrieve this property before the sale.

(Dkt. No. 38 at 2).

In response, the Trustee asserts that the emails from McNamara, Fuzell and Eblen are admissible under the exception to the hearsay rule for admissions of a party opponent. See Fed. R. Evid. 801(d)(2). More specifically, the Trustee argues that these individuals were agents for Equipment and/or Cahaba, and that these emails concerned a matter within the scope of that agency. Indeed, the emails from McNamara indicate he is acting on behalf of Cahaba and Equipment. Furthermore, the emails from Fuzzell and Eblen are sent from "cahabadisaster.com" email accounts. Emails from Fuzzell also include a series of signature lines which highlight his title, "Chief Operating Officer Cahaba Disaster Recovery, LLC." (Trustee Ex. 2). At least one email from Eblen includes a signature line which states: "Cahaba Disaster Recovery, LLC." Id. Moreover, the Trustee asserts that the emails are admissible as relevant evidence for several reasons, for instance, the emails demonstrate that the Trustee actively attempted to assist the Defendants in ascertaining what assets they needed to retrieve from CDP's possession and the emails demonstrate that the Defendants were aware of the CDP bankruptcy case, that some of their equipment was in CDP's possession and that this equipment needed to be retrieved quickly.

The Court agrees with the Trustee both in regard to the question of relevancy and the applicability of the exception to the hearsay rule for admissions of a party opponent in regard to the emails from McNamara, Fuzell and Eblen. See Fed. R. Evid. 801 (d)(2). Furthermore, Equipment's specific hearsay objection must be rejected. The Fifth Circuit has observed, "[t]estimony offered to prove that the party had knowledge or notice is not hearsay." Morrison v. Western Builders of Amarillo, Inc. (In re Morrison), 555 F.3d 473, 483 (5th Cir. 2009); see also Alaniz v. Zamora-Quezada, 591 F.3d 761, 776 n.39 (5th Cir. 2009) ("testimony . . . not hearsay because it was offered to prove that the employer was on notice rather than for the truth of the matter asserted"); U.S. Bank Nat. Ass'n v. Ables & Hall Builders, 696 F. Supp. 2d 428, 436 n.6 (S.D.N.Y. 2010) (emails were admissible because they were admitted to show that the sender did in fact send emails regarding a topic rather than to establish the truth of the matters asserted within the emails); Fed. R. Evid. 801(c). Accordingly, the Defendants' objections to Trustee Exhibit 2 are overruled.

**2. Trustee Exhibit 7**

Trustee Exhibit 7 consists of a four-page document entitled "CDP, Inc. Transactions by Account." The first page of this exhibit notes that CDP has a book basis of $125,000 in a "Steel Spud [Barge] 'CGB-68017.'" The Defendants argue that the document is unsigned, unauthenticated and inadmissible under the hearsay rule. The Trustee argues that the business record exception to the hearsay rule applies. See Fed. R. Evid. 803(6). She also argues that her testimony was sufficient to authenticate the document. Finally, the Trustee argues that Trustee Exhibit 7 was submitted not to establish the truth of the matter asserted in the document, i.e., that CDP in fact had paid $125,000 for Barge CGB-68017, but rather to prove that the Debtor

believed that it owned Barge CGB-68017, whether rightly or wrongly, and thus this exhibit is not hearsay.

During the Hearing, the Trustee described Trustee Exhibit 7 as a quick book listing of CDP's assets as of the date of CDP's conversion from Chapter 11 to Chapter 7. The Trustee recalled that in CDP's Chapter 11 proceedings there had been an issue regarding CDP's broad, general descriptions of its assets in its Chapter 11 Schedules, and, in response, CDP's accountant had prepared Trustee Exhibit 7 for the conversion hearing. (Bankr. Dkt. Nos 115 and 118). The exhibit is dated June 22, 2009, the day of the conversion hearing. According to the Trustee, this exhibit was tendered to the Trustee after her appointment.

The Court finds that the Trustee's testimony is sufficient to authenticate Trustee Exhibit 7. See Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence Manual § 8.01[2] (Matthew Bender & Co./LexisNexis 2010) ("[e]xhibits may be authenticated by the testimony of witnesses with knowledge that they are what the proffering party claims them to be"). The Court also finds that Trustee Exhibit 7 is not hearsay because it has been submitted only to establish that CDP *believed* it owned Barge CGB-68017 at the time of conversion, rather than to establish that CDP in fact owned Barge CGB-68017. See Business Elecs. Corp. v. Sharp Elecs. Corp., 780 F.2d 1212, 1219 (5th Cir. 1986) (finding evidence was not hearsay because it was not offered to prove the truth of the statements in the documents but rather to show that a party *believed* the statements were true); Dittmer v. Texas Southern Univ., No. 10-182, 2011 WL 2162222, at *6 (S.D. Tex. June 2, 2011) (slip opinion) (evidence admitted over hearsay objection in order to establish basis of belief); Fed. R. Evid. 801(c). Accordingly, the Defendants' objections regarding Trustee Exhibit 7 are hereby overruled.

### IV. CONCLUSION

In accord with the analysis above;

**IT IS ORDERED** that the Trustee's Motion (Dkt. No. 5) is **GRANTED** in part and **DENIED** in part. The Motion is **GRANTED** to the extent that Equipment is hereby immediately, preliminarily enjoined from further prosecution of its claims in the Louisiana action for a period of twenty-one days from the date of this Order to allow the Trustee time to file such motion(s) in the Louisiana action as the Trustee deems appropriate or necessary in light of this opinion. The Motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Defendants' evidentiary objections to Trustee Exhibits 2 and 7 (Dkt. Nos. 38 & 41) are hereby **OVERRULED**.

**SO ORDERED.**

Katharine M. Samson
United States Bankruptcy Judge
Dated:  July 22, 2011